**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN SECTION**

_____

**RIVERFRONT DEVELOPMENT, INC.,
As Managing Agent of Mud Island, and
On Behalf of THE CITY OF MEMPHIS,
Owner of Mud Island,**

      **Plaintiff,**

**v.**                                      **No.: 2:16-cv-2553**

**WEPFER MARINE, INC.,**

      **Defendant.**

_____

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

_____

      **COMES NOW** the Plaintiff, Riverfront Development, Inc., as Managing Agent of Mud Island, and on Behalf of the City of Memphis, Owner of Mud Island (hereinafter referred to as the "Plaintiff"), by and through undersigned counsel, and submits this Memorandum of Law in Support of its Motion for Summary Judgment against the Defendant, Wepfer Marine, Inc. ("Defendant"). Specifically, Plaintiff states as follows:

## I.    <u>INTRODUCTION</u>

      Plaintiff brought this case to recover damages from the Defendant for its negligent operation of the M/V LUCY WEPFER vessel ("LUCY WEPFER") on or about July 6, 2015, when the Defendant grounded the LUCY WEPFER and caused real property damage to the tip of Mud Island. The LUCY WEPFER's grounding gouged out two large holes in

Mud Island's landscape.[1] As a matter of law and upon the record in this case, Defendant is liable to Plaintiff for the damages caused by its negligent operation of the LUCY WEPFER and must compensate Plaintiff for the reasonable costs of repairing the damage to Mud Island.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is only "appropriate where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[2]  The moving party bears the burden of proving that there are no genuine issues of material fact.[3] The ultimate inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[4] The Sixth Circuit has explained as follows:

> Not every factual dispute between the parties will prevent summary judgment. The disputed facts must be material. They must be facts which, under the substantive law governing the issue, might affect the outcome of the suit. The dispute must also be genuine. The facts must be such that if they were proven at trial a reasonable jury could return a verdict for the non-moving party. The disputed issue does not have to be resolved conclusively in favor of the nonmoving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial.[5]

Moreover, the "non-movant must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some

---

[1] *See Plaintiff's Statement of Undisputed Material Facts in Support of Plaintiff's Motion for Summary Judgment*, para. 11, filed contemporaneously herewith; *see* also Exhibit 8T to *Deposition of Jim Reeder* (May 24, 2017).
[2] Fed. R. Civ. Pro. 56(c).
[3] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).
[4] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).
[5] *Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435-36 (6th Cir. 1987).

metaphysical doubt as to material facts.[6]" Further, "[s]ummary judgment should not be disfavored and may be an appropriate avenue for the 'just, speedy and inexpensive determination' of an action."[7]

Upon the entire record in this cause, even with all the evidence viewed in a light most favorable to the Defendant, Plaintiff is entitled to summary judgment against the Defendant for negligence and damages under the maritime laws of the United States.

### III.   LAW & ARGUMENT

Plaintiff brought this action under the Extension of Admiralty Jurisdiction Act, under which this Court has jurisdiction to adjudicate Plaintiff's claims against the Defendant for property damage "caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land."[8] At the present time, the posture of this case under federal maritime law supports its full disposition under Fed. R. Civ. P. 56. Therefore, Plaintiff moves the Court for summary judgment on the following three (3) issues, which will resolve this matter in its entirety:

(1) Mud Island constitutes "special purpose property," which is an exception to the "lesser-of" rule applied to damages for injury to property;

(2) The Defendant is at fault for damaging Mud Island; and

(3) The Defendant's conduct caused the damage to Mud Island.

First, as land owned and developed by the City of Memphis for the exclusive use and benefit of the public, Mud Island does not belong to a real estate market in which it

---

[6] *Charles v. Air Enterprises, LLC*, 2017 WL 1078962, at *3 (N. D. Ohio 2017), citing *Fulson v. City of Columbus*, 801 F.Supp. 1, 4 (S.D. Ohio 1992).
[7] *Dowling v. Klement*, 2010 WL 3429647, at *2 (E.D. Tenn. 2010), quoting *Celotex Corp.*, at 327.
[8] 46 U.S.C. App. § 740.

can be bought or sold like privately held land.[9] Therefore, in suffering damage because of Defendant's negligence, Mud Island falls outside of the typical rules governing recoverable damages for injured property.

Second, the nature of the Defendant's conduct brings this case within federal maritime law,[10] which grants the Plaintiff two (2) critical presumptions. Specifically, Plaintiff is entitled to (1) the presumption that the Defendant is at fault for grounding its barge on Mud Island, and (2) the presumption that the Defendant's conduct caused the damage to Mud Island. Importantly, the Defendant has not submitted evidence to rebut these presumptions, because the Defendant's experts fundamentally rely upon inadmissible evidence in presenting their opinions.

### A. Mud Island is a "Special Purpose Property," thus entitling the Plaintiff to the Cost of Repair as the Proper Legal Measure of Calculating Damages

In actions to recovery for injury to real property, compensatory damages are typically measured by the *lesser-of* either (1) the costs of repairing the damage, or (2) the diminution in the value of the land.[11] However, this general "lesser-of" rule does not apply in every instance of property damage. Where certain real property is categorized as "**special purpose property**" this rule does not apply and damages are measured by cost of repair**.** The Sixth Circuit has recognized this exception, noting that "[a] different analysis applies to cases involving…**harm to unique or special purpose properties**."[12]

---

[9] *See Plaintiff's Undisputed Facts*, para. 1 through 3; see also paragraphs 3, 5-7 of the *Declaration of D. McGowen*, attached as "Exhibit A" to *Plaintiff's Undisputed Facts.*

[10] *See Sisson v. Ruby*, 497 U.S. 358, 374 (1990): the issue of whether a cause of action sounds in federal maritime law is governed generally by three (3) criteria, to wit: (1) whether a "vessel" in involved; (2) whether the occurrence takes place on "navigable waters" of the United States; and (3) whether the occurrence "bears a significant relationship to traditional maritime activity."

[11] *Lichtefeld v. Mactec Engineering & Consulting, Inc.*, 239 Fed. Appx. 97, 102 (6th Cir. 2007), citing *Ellison v. R & B Contracting*, 32 S.W. 66, 69 (Ky. 2000).

[12] *Lichtefeld*, at 102, n.4, citing *Trinity Church in the City of Boston v. John Hancock Mut. Life Ins.* Co., 502 N.E.2d 532, 533 (Mass. 1987) (emphasis added).

As discussed further below, Mud Island is municipally-owned property, specially set aside as park land by the City of Memphis. Therefore, Mud Island constitutes "special purpose property," rendering the "cost of repair" rule applicable in calculating Plaintiff's property damages.

1. "Special Purpose Properties" have no active market for sale, making it impossible to measure a diminution in value caused by injury to unique properties

While the Sixth Circuit has recognized the "special purpose property" exception, it has not had occasion to apply this exception in an actual appeal. Nevertheless, in recognizing the doctrine, the Sixth Circuit referred to *Trinity Church in the City of Boston v. John Hancock Mutual Life Insurance Company*, which is a seminal case in the corpus of "special purpose land" cases.[13] In *Trinity Church*, a church was damaged during the construction of an adjacent building. In finding that the damage to the church should be measured by the cost of repair as opposed to diminution in value, the Massachusetts Supreme Court explained its ruling as follows:

> The general rule for measuring property damage is diminution in market value. However, "market value does not in all cases afford a correct measure of indemnity, and is not therefore 'a universal test.'" **For certain categories of property, termed "special purpose property" (such as the property of nonprofit, charitable, or religious organizations), there will not generally be an active market from which the diminution in market value may be determined**.[14]

In so holding, the court recognized the profound difficulty of applying a diminution in property value to properties so unique that no real market exists for the sale of such

---

[13] *Trinity Church in the City of Boston v. John Hancock Mut. Life Ins.* Co., 502 N.E.2d 532, 533 (Mass. 1987).

[14] *Id.*, at 535-6; citing *Hopkins v. American Pneumatic Serv. Co.*, 80 N.E. 624 (Mass. 1904); *Wall v. Platt*, 48 N.E. 270 (Mass. 1897); *Commonwealth v. Massachusetts Turnpike Auth.*, 224 N.E.2d 186 (Mass. 1967); *Newton Girl Scout Council, Inc. v. Massachusetts Turnpike Auth.*, 138 N.E.2d 769 (Mass. 1956) (emphasis added).

property. In fact, the Supreme Court of the United States in 1949 recognized this very issue in *United States v. Toronto*, in the context of an eminent domain dispute.[15] In relevant part, the Supreme Court explained as follows:

> At times, however, **peculiar circumstances may make it impossible to determine a "market value."** There may have been, for example, so few sales of similar property that we cannot predict with any assurance that the prices paid would have been repeated in the sale we postulate of the property taken. **We then say that there is "no market" for the property in question**.[16]

In recognizing the inherent difficulty in measuring the value of unique property for which no market exists, several other courts have also applied the "special purpose property" doctrine.

In *Tampa Bay Water v. HDR Engineering, Inc.*, the United States District Court for the Middle District of Florida held that **publicly owned property** fell within the "special purpose land" exception.[17] The court explained its holding:

> Moreover, in Florida, **because publicly owned facilities, unlike privately held land, do not lend themselves to traditional value determination, diminution in value may not justly compensate the owner** in defective construction cases and restoration costs may be the proper measure of damages. In [*Davey Compressor Co. v. City of Delray Beach*], **the Florida Supreme Court refused, based on public policy, to apply the diminution in value measure of damages to a municipal water supplier's claim for damages, even where restoration costs exceed that value**.

Moreover, in *Fordyce v. United States*, the United States Claims Court provided a non-exhaustive list of unique property that falls within the category of "special purpose property."[18] While rejecting the plaintiffs' contention that a "bathhouse" is a special use

---

[15] *United States v. Toronto*, 338 U.S. 396 (1949).
[16] *Toronto*, at 402 (emphasis added).
[17] *Tampa Bay Water v. HDR Engineering, Inc.*, 2011 WL 3101803 (M.D. Flor. 2011).
[18] *Fordyce v. United States*, 7 Cl. Ct. 591 (1985).

property, the Claims Court stated:

> Special use properties have no market. Examples of such properties include **public facilities** such as roads and sewers, or a church, college building or clubhouse located in a town in which there is but one religious society, or college or club.[19]

In this case, Mud Island falls clearly within the "special purpose property" category.

2.  <u>Mud Island is a "Special Purpose Property"</u>

It is undisputed that Mud Island is owned by the City of Memphis, which has set its aside for the exclusive purpose of public park land.[20] Mud Island therefore falls squarely within the type of property recognized by courts as "special purpose property."

Perhaps most critically, no market exists for the potential sale of Mud Island, as there is no market for the buying and selling of public park land.[21] Plaintiff submits herewith the *Declaration of Douglas McGowen*, who is employed as the Chief Operating Officer of the City of Memphis.[22] COO McGowen testified that the City of Memphis owns and developed Mud Island for the sole and exclusive purpose of operating it as park land for the use and benefit of the public and that it has no known market.[23]

Therefore, it is impossible to assign a monetary value to Mud Island, let alone calculate the diminution in value suffered as a result of the Defendant's negligence.

3.  <u>As a damaged "Special Purpose Property," the only legal measure of damages is the cost of repairing the damage</u>

With Mud Island properly categorized as a "special purpose property," the cost of repair is the correlating measure of recoverable damages necessitated by the

---

[19] *Id.*, at 599 (emphasis added).
[20] *See Plaintiff's Undisputed Facts*, para.1 through 3; *see* also paragraphs 3, 5-7 of the *Declaration of Douglas McGowen*, attached as "Exhibit A" to *Plaintiff's Undisputed Facts*.
[21] *Declaration of D. McGowen*, para. 7.
[22] *Id.*, para. 1.
[23] *Id.*, at para. 5 through 7.

Defendant's negligent conduct. In this case, the diminution in value would not apply to Plaintiff's damages, even if the Defendant had submitted proof of the diminution in value, which it has not.[24] Neither has the Defendant submitted any competing evidence to suggest that Plaintiff's cost of repair evidence in the record is unreasonable.

Plaintiff has submitted cost of repair quotes from marine contractor Luhr Bros., Inc. to repair the damage to Mud Island in the amount(s) of $444,000 and $522,000.[25]  These quotes are based upon the necessary labor and cost of materials needed to fill the two holes created by the Defendant as measured by Jim Reeder, who is an engineer and Project Development Manager for Plaintiff. Mr. Reeder determined that 12,000 cubic yards of dirt were gouged out from Mud Island by the Defendant.[26]

Contemporaneous with this Motion, Plaintiff submits the *Affidavit of William Gardner*, who is an officer of Luhr Bros., Inc., testifying to the quotes to repair the damage to Mud Island.[27]   At the same time, the Defendant has not submitted any competent evidence from any witness that contradicts the reasonableness of the Luhr Bros., Inc. quotes. Therefore, the only competent and undisputed evidence in the record concerning a calculation of damages for cost of repair is the evidence from marine contractor Luhr

---

[24] *See Tampa Bay Water*, at *7, n.11: "*See* 6 Bruner & O'Connor Construction Law 19:30 ("Once an owner has proven its cost of repair, the burden shifts to the contractor to provide that the cost of repair exceeded the diminution in value and thus resulted in economic waste."); *see* also *Metropolitan Government of Nashville and Davidson County v. BFI Waster Services, LLC*, 2012 WL 1018946, at *8 (Tenn. 2012) (holding that "the plaintiffs do not have the burden of offering alternative measure of damages. The burden is on the defendant to show that the cost of repairs is unreasonable when compared to the diminution in value."; quoting *Conaster v. Ball*, 2001 WL 873457, at *12 (Tenn. Ct. App. Aug. 3, 2011)).

[25] *See Plaintiff's Undisputed Facts*, para. 18; *see* also *Affidavit of William Gardner*, para. 5, 6, attached as "Exhibit I" to *Plaintiff's Undisputed Facts*: The two respective quotes reflect whether (1) Luhr Bros., Inc. would provide the necessary materials and labor ($422,000), or whether (2) Luhr Bros., Inc. would obtain the materials from another local provider while nevertheless providing the labor ($544,000).

[26] *See Plaintiff's Undisputed Facts*, para. 16; *see* also *Deposition of Jim Reeder* (May 24, 2017), pg.17:15-25 through 18: 1-7; 39:1-25 through 55: 1-11 and corresponding deposition Exhibits 5, collective 7 and collective 8, attached as "Exhibits C, G and H" to *Plaintiff's Undisputed Facts*.

[27] *See Plaintiff's Undisputed Facts*, para. 18; *see* also *Affidavit of William Gardner*, para. 5, 6, attached as "Exhibit I" to *Plaintiff's Undisputed Facts.*

Bros., Inc. Importantly, the Plaintiff's damages for the cost of repair is significantly less than the value of the LUCY WEPFER, which operates as the only cap on a maritime plaintiff's damages under federal maritime law.[28]

## B.  The Defendant is at Fault for Damaging Mud Island

Federal maritime law mandates that the Plaintiff is entitled to the presumption that the Defendant is at fault. In particular, federal maritime law imposes a presumption against the operator of a vessel where the moving vessel (the LUCY WEPFER) strikes a stationary object (Mud Island).

### 1.  The *Oregon* Rule establishes a presumption of fault when a moving vessel strikes a stationary object

The presumption of fault dates back to 1895, when the Supreme Court of the United States adopted the *Oregon* Rule.[29] The Sixth Circuit concisely explained the *Oregon* Rule as follows:

> The *Oregon* Rule applies to allisions,[30] establishing a rebuttable presumption that, when a moving object hits a stationary object, **the moving object is at fault**.[31]

In an *Oregon* Rule scenario, the Court must inquire into all of the circumstances preceding the allision, including the navigation of the vessel, the actions of those on board the vessel and the events leading up to the allision. The Sixth Circuit further explained the application of the *Oregon* Rule:

> Not unlike the doctrine of *res ipsa loquitor*, the *Oregon* Rule creates a *prima facie* case of negligence, [but] not a final case of sole negligence. Based on

---

[28] *See* Defendant's Response to Plaintiff's Interrogatory No. 23, estimating the M/V LUCY WEPFER's residual value at $1,400,000. *See* also Limitation of Liability Act, 46 U.S.C. §§181 – 196.

[29] *The Oregon*, 158 U.S. 186 (1895).

[30] "Admiralty law draws a distinction between allisions and collisions. An allision occurs when a moving vessel strikes a stationary object, and a collision occurs when two moving vessels strike each other." *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 362 (6th Cir. 2010); citing *Fischer v. S/Y NERAIDA*, 508 F.3d 586, 598 n.1 (11th Cir. 2007).

[31] *Bessemer*, at 362 (emphasis added).

the **"common-sense observation that moving objects do not usually [a]llide with stationary objects unless the vessel is mishandled in some way," the rule presumptively allocates fault when the circumstances of an allision are unknown** – requiring the party most likely to know what happened (the moving vessel) to present evidence to rebut the presumption of fault." But when "the parties have introduced evidence to dispel the mysteries that gave rise to the presumption," the Oregon Rule has no factual void to fill.[32]

Once the *Oregon* Rule is triggered, the operator of the moving vessel has three (3) ways to rebut the presumption of fault by demonstrating the following:

(1) the allision was actually the [sole] fault of the stationary object; (2) the moving vessel acted with reasonable care; or (3) the allision was the result of an inevitable accident.[33]

As discussed further herein, the record demonstrates conclusively that the Defendant has not rebutted the presumption of fault triggered by the *Oregon* Rule through competent evidence.  As such, Defendant is presumptively at fault for alliding with Mud Island.

2.  <u>The Defendant has not rebutted the presumption of fault triggered by the *Oregon* Rule</u>

Once the presumption of fault attaches to Defendant's conduct under the *Oregon* Rule, federal maritime law permits the Defendant to rebut that presumption. However, the record is clear that the Defendant's proof as a matter of law is not competent to rebut the presumption of fault. The Defendant has not presented competent proof that Capt. Jared LaFrance ("Capt. LaFrance") acted with reasonable care in operating the LUCY WEPFER.[34]

A. *Inadmissible hearsay cannot create a genuine issue of material fact sufficient to survive summary judgment*

---

[32] *Bessemer*, at 362; citing *In re Mid-South Towing Co.*, 418 F.3d 526, 531-32 n.6 ((5th Cir. 2005), *City of Chicago v. M/V Morgan*, 375 F.3d 563, 572 (7th Cir. 2004) (emphasis added).
[33] *City of Chicago*, at 573.
[34] *Id.*

As a threshold matter, Plaintiff emphasizes that "**inadmissible hearsay evidence cannot be considered on summary judgment**."[35] The inadmissible hearsay at issue here is the **accident report** containing the narrative prepared **by the Defendant** for the United States Coast Guard (USCG form 2692).[36] In this case, Defendant's expert witness was compelled to rely on the accident report form 2692 because the person piloting the LUCY WEPFER (Capt. LaFrance) was not presented by the Defendant for deposition during the discovery deadlines of this case and his deposition testimony is not in the record.[37] Form 2692, which was prepared for the Coast Guard by the Defendant, is itself inadmissible hearsay. Further, the narrative contained in Form 2692 is itself inadmissible hearsay within hearsay. Moreover, even if the Defendant's expert witness had instead relied upon a report completed by the Coast Guard at close of the investigation, as opposed to the Defendant, such a report would nevertheless be inadmissible hearsay as well.[38]

Additionally, Capt. LaFrance was the only individual with personal knowledge of the facts leading up to the grounding, because all of the Defendant's other employees were in the galley and did not personally witness any of the critical events.[39] However, Capt. LaFrance never testified to these events in the record, despite Plaintiff's ongoing requests for his deposition prior to the Amended Scheduling Order's deadlines for

---

[35] *DeBiasi v. Charter County of Wayne*, 537 F.Supp.2d 903, 911 (6th Cir. 2008), citing *Jacklyn v. Schering-Plough Healthcare Prod. Sales Corp.*, 176 F.3d 921, 927 (6th Cir.1999) (emphasis added).
[36] *See* attached as "**EXHIBIT A**."
[37] *See Report of Capt. John R. Sutton*, pg. 6 (attached hereto as "**EXHIBIT B**").
[38] *See Petition of Cleveland Tankers, Inc.*, 821 F.Supp. 463 (E.D. Mich. 1992) (holding that USCG reports are inadmissible as evidence in private litigation arising out of the accident that was the subject of the report); citing *Huber v. United States*, 838 F.2d 398 (9th Cir. 1988).
[39] *Plaintiff's Undisputed Facts*, para. 9; see also *Depo. Gerald Bloom*, pg. 21:17-24 through 22:1-15, 25:8-17, 37:4-16; *Depo. John Steele*, pg. 15:21-24 through 16:1-9, 27:5-12 (relevant portions attached as "Exhibits E and F" to *Plaintiff's Undisputed Facts*).

completing discovery and the Plaintiff's disclosure of expert witnesses.[40]

> ### B. Defendant's expert opinions on the reasonableness of Capt. LaFrance's operation of the LUCY WEPFER are inadmissible

Defendant tendered three expert reports, including the report of Capt. John R. Sutton ("Capt. Sutton,"). Capt. Sutton was presented to opine on the reasonableness of Capt. LaFrance's navigation of the LUCY WEPFER. However, Capt. Sutton's opinions cannot establish any genuine issues of material fact, because Capt. Sutton relies upon inadmissible hearsay, including the USCG form 2692 and the hearsay narrative included therein.[41]

In his report, Capt. Sutton provides a "Narrative of the Events" prior to disclosing his opinions.[42] However, several critical "facts" upon which Capt. Sutton bases his opinions are not in the record, as the only individual with personal knowledge of these events is Capt. LaFrance. These hearsay "facts" include that Capt. LaFrance supposedly encountered a "pleasure craft" and "kayakers" as he approached the Mississippi River,[43] thus placing the LUCY WEPFER "in a situation of extremis" and requiring Capt. LaFrance to turn the vessel.[44] **However, even Capt. Sutton admits that "<u>we have no direct testimony from Captain LaFrance as to what he did and/or did not know and 'we'</u>**

---

[40] Based upon the Defendant's failure to produce Capt. LaFrance in a timely manner, Plaintiff has already notified the Defendant on May 18, 2017 of Plaintiff's expectation that Capt. LaFrance will not be testifying at trial. While the Plaintiff requested and expected to take Capt. LaFrance's deposition on May 23, 2017 along with the LUCY WEPFER deckhands, Defendant advised that it would not be able to produce Capt. LaFrance for a deposition until July 4, 2017 the earliest. However, the Amended Scheduling Order imposed deadlines on the Plaintiff to complete all discovery by June 2, 2017, and to disclose Plaintiff's expert witnesses by June 30, 2017, both of which expired before the Defendant would have produced Capt. LaFrance. Therefore, Plaintiff was forced to proceed with its expert disclosures and reports based only upon the record as it existed at that time.
[41] *See Capt. Sutton Report*, p.3, 6.
[42] *Capt. Sutton Report*, p.2.
[43] *Id.*
[44] *Id.*

**are relying on the statement in the USCG 2692 form**."[45] Once again, the USCG form 2692 was drafted by the Defendant for the United States Coast Guard, which itself is inadmissible hearsay, and contains within it the hearsay narrative.

Therefore, any and all of Capt. Sutton's opinions concerning the propriety or reasonableness of Capt. LaFrance's navigation are based upon inadmissible hearsay and facts not in the record. As such, the Defendant has offered no competent proof to rebut the presumption that it is at fault for grounding the LUCY WEPFER on Mud Island.

## C. The Defendant's Conduct Caused the Damage to Mud Island

Federal maritime law also grants Plaintiff the presumption that the Defendant's conduct caused the damage to Mud Island under the *Pennsylvania* Rule.

1. The *Pennsylvania* Rule establishes a presumption of causation when a statutory violation results in injury to a party protected by the statute

The Supreme Court of the United States created the *Pennsylvania* Rule concerning causation in 1873.[46] The Sixth Circuit explained the *Pennsylvania* Rule as follows:

> The *Pennsylvania* doctrine holds that when a statutory rule intended to prevent an admiralty accident exists and a party violates that statute injuring a party whom the statute was intended to protect, **the violating party, to avoid liability, must show that the violation could not have been the cause of the accident**.[47]

The Sixth Circuit has also adopted the Fifth Circuit's summary of the Pennsylvania Rule, which is more on point for the present case:

> [T]hat when, at the time of a collision, a ship "is in actual violation of a statutory rule intended to prevent collisions…the burden rests upon the ship of showing not merely that her fault might not have been one of the causes,

---

[45] *Id.*, pg. 3 (emphasis added).
[46] The Pennsylvania, 86 U.S. 125 (1873).
[47] *Pearce v. United States*, 261 F.3d 643, 648 (6th Cir. 2001), citing *The Pennsylvania*, at 136 (emphasis added).

or that probably was not, *but it could not have been*."[48]

Importantly, "**[n]avigation rules have been strictly and literally construed**" by the Supreme Court and the Sixth Circuit.[49] Therefore, a critical point in applying the *Pennsylvania* Rule turns on whether a violated navigational rule is given statutory weight, so as to trigger the presumption. In this case, the navigational rules at issue derive from the Inland Navigational Rules Act of 1980 ("Inland Navigational Rules.")[50]

The Sixth Circuit has consistently referred to and given statutory weight to the Inland Navigational Rules to trigger application of the *Pennsylvania* Rule.[51] In *Grosse Ile Bridge Co. v. American Steamship Co.*, the Sixth Circuit analyzed Inland Navigational Rule 5, which is at issue in the present case, and subjected the case to a *Pennsylvania* Rule analysis.[52] The *Grosse Ile* court stated that,

> By statute [i.e., Inland Navigational Rule 5], "[e]very vessel **shall at all times maintain a proper look-out by sight and hearing as well as by all available means** appropriate in the prevailing circumstances and conditions so as to make a full appraisal of the situation and of the risk of collision."[53]

While the *Grosse Ile* court held that the ship had successfully rebutted the presumption of causation provided by the *Pennsylvania* Rule by demonstrating the competence of the ship's second look-out,[54] the court explained that Rule 5 exists to specifically avoid collisions, stating that "[a] lookout must be a person of suitable experience and vigilance,

---

[48] *Algoma Cent. Corp. v. Michigan Limestone Operations*, 74 F.3d 1240, at *8 (6th Cir. 1996), quoting *Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1471 (5th Cir. 1991) (quoting *The Pennsylvania*, at 136 and adding emphasis).
[49] *Reiss S.S. Co. v. U.S. Steel Corp., Pittsburgh S.S. Div.*, 374 F.2d 142, 147 (6th Cir. 1967), citing *Belden v. Chase*, 150 U.S. 674, 698 (1893) (emphasis added).
[50] 33 U.S.C. § 2005, *et seq.*
[51] *See Grosse Ile Bridge Co. v. American Steamship, Co.*, 302 F.3d 616 (6th Cir. 2002), *In re Buccina*, 657 Fed. Appx. 350 (6th Cir. 2016).
[52] *Grosse Ile*, at 622.
[53] *Id.* (emphasis added).
[54] *Id.*, at 622-3.

**stationed at a place where the risk of danger of collision may be readily**

**perceived**."[55] Therefore, the proper look-out mandate for vessels on navigable waters is

statutorily required to avoid striking other vessels or unmoving objects.

On this point, the Sixth Circuit cited to an analogous case from the Fifth Circuit,

which involved a collision between a ship and a wharf. [56] The court summarized the Fifth

Circuit's ruling that "the defendant vessel had failed to post a proper lookout because,

although well-positioned on the bow and apparently capable of observing the important

signs of danger, the lookouts were not adequately vigilant in executing their duties prior

to the collision between the vessel and the wharf."[57]

> 2. The Defendant is presumed to have caused the property damage to Mud Island for violating navigational rules intended to protect objects like Mud Island

In the present case, the Defendant violated Inland Navigation Rule 5, causing

damage to Mud Island. Inland Navigation Rule 5 required the Defendant to utilize "all

available means" in maintaining a proper look-out, to avoid collisions, including allisions

with land masses like Mud Island. Immediately prior to striking Mud Island, two (2) of the

Defendant's deckhands both testified that the entire crew was in the galley, except for

Capt. LaFrance, the pilot of the LUCY WEPFER, while the ship was attempting to

navigate the Wolf River towards the Mississippi River.

As such, only Capt. LaFrance was acting as look-out, despite three (3) deckhands

being on board.[58] Therefore, the *Pennsylvania* Rule establishes that the Defendant is

---

[55] *Id.*, at 622 (emphasis added).
[56] *Id.*, citing *Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 800 (5th Cir. 1977)
[57] *Id.*
[58] *Plaintiff's Undisputed Facts*, para. 9; see also *Depo. Gerald Bloom*, pg. 21:17-24 through 22:1-15, 25:8-17, 37:4-16; *Depo. John Steele*, pg. 15:21-24 through 16:1-9, 27:5-12 (relevant portions attached as "Exhibits E and F" to *Plaintiff's Undisputed Facts*).

presumptively the cause of the damage to Mud Island.

Additionally, the Defendant violated Inland Navigation Rule 6. Inland Navigation Rule 6 prohibits vessels from moving at an excessive speed, and provides, in pertinent part, as follows:

> **Every vessel shall at all times proceed at a safe speed so that she can take proper and effective action to avoid collision and be stopped within a distance appropriate to the prevailing circumstances and conditions**.
>
> In determining a safe speed, the following factors **shall** be among those taken into account:
>
> > (a) By all vessels:
> > > …
> > > (ii) the traffic density including concentrations of fishing vessels or any other vessels;
> > > (iii) the maneuverability of the vessel with special reference to stopping distance and turning ability in the prevailing conditions;
> > > …
> > > (v) the state of wind, sea and current, and the proximity of navigational hazards;
> > > (vi) the draft in relation to the available depth of water.
> >
> > (b) Additionally, by vessels with operational radar:
> > > …
> > > (iv) the possibility that small vessels, ice and other floating objects may not be detected by radar at an adequate range;
> > > (v) the number, location and movement of vessels detected by radar;
> > > (vi) the more exact assessment of the visibility that may be possible when radar is used to determine the range of vessels or other objects in the vicinity.

The clear intent of Inland Navigation Rule 6 is to prevent collisions (or allisions) on account of a ship's excessive speed. Therefore, the avoidance of an allision with Mud Island is within the contemplation of Rule 6, thus triggering the presumption of causation as to the damage suffered by the land.

The Defendant has not rebutted this presumption either. In fact, Defendant's expert Capt. Sutton presumes again, and merely speculates, that Capt. LaFrance "proceeded outbound on the Wolf River at a no wake speed as the entire length of the Wolf River is a no wake area."[59] However, the actual speed the LUCY WEPFER was traveling is not in the record. Capt. Sutton's assumption that Capt. LaFrance simply abided by the "no wake" rule does not create a genuine issue of material fact concerning the speed of the ship.

Finally, Capt. Sutton suggests that the LUCY WEPFER did not create the holes in Mud Island, stating that "the holes washed in the foot of Mud Island are a direct result of the wheel wash of the M/V Lucy Wepfer and M/V Ricky Robinson attempting to free the barge MPC-76 from its grounding location."[60] Whether the Defendant created the holes during the grounding or in the removal of the grounded ship is of no legal import. Rather, the Defendant's negligent conduct that caused the damage, even according to Capt. Sutton.

Therefore, the Defendant has not rebutted the presumption of causation created by federal maritime law.

### D. CONCLUSION

In conclusion, summary judgment is appropriate at the present time. First, Mud Island is "special purpose property," thus making the cost of repair, not the diminution in value, the correct legal measure for calculating the Plaintiff's damages. Second, the record reflects the clear and legally appropriate model of damages in the quotes from Luhr Bros., Inc. Third, federal maritime law entitles the Plaintiff to the presumptions that

---

[59] *Capt. Sutton Report*, p. 2.
[60] *Id.*, at p.3.

the Defendant is at fault for grounding the LUCY WEPFER and that the Defendant's conduct caused the damage to Mud Island. Finally, Defendant's proof does not rebut the presumptions of fault or causation as a matter of law.

Respectfully submitted,

/s/ Robert L. J. Spence, Jr.
ROBERT L. J. SPENCE, JR. (BPR #12256)
ANDREW M. HORVATH (BPR #33862)
The Spence Law Firm, PLLC
80 Monroe Avenue
Garden Suite One
Memphis, Tennessee 38103
901-312-9160

J. MICHAEL FLETCHER (BPR #6954)
125 N. Main Street, Room 336
Memphis, Tennessee 38103
901-636-6614

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was electronically filed with the Clerk of the Clerk via the ECF System, which forwarded electronic notification of the filing to the following:

Frank J. Dantone, Esq.
Henderson Dantone, P.A.
241 Main Street
P.O. Box 778
Greenville, MS 38702-0778

Larry Montgomery, Esq.
Glankler Brown
6000 Poplar Ave., Suite 400
Memphis, Tennessee 38119

*Attorneys for Defendant*

this 25th day of September, 2017.                    /s/ Robert L. J. Spence, Jr.